CHARLES L. SPRINGER and WILLIAM H. SPRINGER

v.

ANN M. LAWRENCE.

1. A portion of three farms along a river had been reclaimed by a continuous bank between high and low-water mark. The highland on the centre farm formed a cape, projecting into the lowland, and it was 'connected with the bank by a cross-bank, so that three-fifths of the centre farm drained through the upper farm and two-fifths, about twenty acres, through ditches running to a sluice in the bank on the lower farm. In 1851 the cost of maintaining the bank, ditches and sluices was divided between the farms by commissioners appointed by the court. In 1856 the owner of the lower farm made a new take-in by erecting a bank nearer the river than the old, thus reclaiming about seven acres. In 1875 the owners of the centre farm made a new take-in of twenty-three acres, which they drained through the ditches on the lower farm, the owner of which knew that the new take-in was being made, and did not object, but for ten years acquiesced in the increased drainage through his land. In 1883 he built a new sluice, and called on the owners of the centre farm to pay one-third of the expenses, which they did.—*Held*, that the owner of the lower farm was estopped from denying the right of the owners of the centre farm to drain the new take-in through his land, but they should be required to submit to a reapportionment of the cost of maintaining the bank, sluice and ditches, and to extend the cross-bank from the old to the new bank, so that the land above the cross-bank will drain upon the upper farm.

2. On the division of a farm, to which is attached the right to drain through the lands of another, the owners of the several portions may join in a suit to enjoin the obstruction of the drainage.

. Heard on bill, answer and proofs in open court.

*Mr. Austin H. Swackhamer*, for the complainants.

*Messrs. Grey & Grey*, for the defendant.

PITNEY, V. C.

The complainants, by their bill, ask the court to restrain the defendant from obstructing certain ditches on her own land, on the ground that they (the complainants) have a right of drainage through them for their adjoining land. The defendant, by her answer, admits such right as to a portion of complainants' land, but denies it as to another portion, and alleges that the complainants have overcharged their easement by adding the drainage of such other portion, and for that reason she (the defendant) proposes to stop the ditches in question.

The lands in question are situate in Gloucester county, on the Delaware river, opposite the north end of Raccoon or Cadwalader island. The river at this point runs in a course a little south of west. The defendant owns a farm just up the river from the bridge connecting the island with the mainland. The complainants own in severalty portions of a farm adjoining the defendant on the northeast; and next to the complainants' farm, on the northeast, is one belonging to one Beckett.

In 1851 the defendant's farm was owned by her husband, Thomas R. Lawrence, who, at his death, which occurred in 1862, devised it to her; the complainants' farm was owned by their father, Richard F. Springer, and the Beckett farm was owned by one Lewis Passmore. A considerable portion of each of these farms was below the level of the high water of the river, but had been reclaimed after the mode long in use along the Delaware river, viz.: (1) by a continuous bank running along the river between high and low-water mark; (2) by two or more conduits, built of timber and called sluices, laid across and at the bottom of this bank, provided with gates acting automatically, so as to let the water run out at low tide and prevent its return at high tide; and (3) by a system of ditches cut through the meadows, so as to gather the water and convey it to the sluices. This bank, with these sluices and system of ditches, had been erected many years before that date, presumably by some arrangement between the then several owners of the three farms, and the low lands reclaimed were under cultivation.

· In 1851, upon the application of Richard F. Springer, the complainants' father, the court of common pleas of Gloucester county appointed a commission—under the sixteenth section of the act of November 29th, 1788 (*Rev. pp. 642, 644*), entitled "An act to enable the owners of the tide swamps and marshes to improve the same, and the owners of meadows already banked in, and held by different persons, to keep the same in good repair "— to divide the banks and works between the land-owners, and allot to each the part he was to maintain &c. The commissioners so appointed surveyed the premises and made a map of them, and a report with the map annexed. They found the bank to be eight hundred and seventy-five rods long, and they allotted to Passmore to maintain five hundred and fifty rods, to Springer one hundred and seventy-five rods and to Lawrence one hundred and thirty-four rods, and to one Tomkin, who owned a small lot on the extreme southwest end, sixteen rods. The allotments were nearly or quite according to ownership. They also laid out and laid down on the map two several water-courses or ditches to be kept open, and two sluices to be maintained through the bank at the end of these ditches, making two sets of ditches and sluices, one of which was wholly on Passmore's land, and one wholly on Lawrence's; and they directed that these sluices and ditches, as well as vents or ditches outside the bank and reaching low-water mark, should be maintained by the three owners as follows : Passmore should bear two-thirds of the expense of the drain and sluice on his land and Springer one-third. In addition, Passmore was to bear the whole of the expense of a third ditch and sluice on his land next the cedar swamp which skirted it on the southeast, and Lawrence should bear two-thirds of the expense of the drain and sluice on his land and Springer one-third thereof. The high land on the Springer farm formed a promontory or cape, projecting into the meadow and approaching within sixty-five rods of the bank, and was connected with the bank by a cross-bank, shown on the commission map, by which Springer's meadow was divided, so that about three-fifths of it drained on to Passmore and two-fifths, amounting to twenty-one acres, drained on to Lawrence. And that mode of drainage was in

accordance with the natural lay of the land. Lawrence's meadow contained about sixty-five acres.

The sluices in this case were so located as to be as near as practicable to low-water mark of the river. The object of this was to minimize the trouble and expense of keeping open the communication between the sluices and low-water mark across the stretch of meadow which laid outside the bank, and which communication, owing to the wash of the waves, was liable to fill up. At the same time as much of the bank as practicable was placed at some distance from low-water mark, leaving outside of it a stretch of flats which, though ordinarily covered at high tide, still served as a guard for the bank against the effect of heavy northwest winds at high tide. The bank on Springer's lands was so protected by a guard of flats nearly one hundred rods wide, while the space between the bank on Lawrence's land and low-water mark was only about one-quarter of that distance, still his bank was especially protected by Raccoon island. The land lines between the farms seem to be about at right angles with the bank.

All parties acquiesced in this report, and no question is raised as to its validity.

In 1856, five years after this report of the commissioners, Lawrence made what is called a new take-in, by erecting a new bank further towards the river than the old one. He commenced on the old bank, about four rods from the line between him and Springer, and erected a new bank at right angles to the old one for a distance of about thirteen rods towards the river; then he turned and ran nearly parallel with the old bank, and about fourteen rods distant from it, a distance of one hundred and ten rods, and there struck and connected with a projecting angle of the old bank. By this work he enclosed and added to his meadow about seven acres of land. It does not appear that the other landowners in the original lay-out were consulted or their consent asked to this increase. This new take-in of Lawrence has been so maintained ever since.

In 1872 Richard F. Springer died, and shortly afterwards his farm, which was treated as including the stretch of land between

high and low-water mark outside the bank, was sold by commissioners. The greater portion of the outside flats became vested in the complainant William H. Springer, and the farm, including the bank and a narrow strip outside, was vested in Charles L. Springer. These brothers in the fall, winter and spring of 1874–1875 also made a new take-in opposite the Springer bank, which included land belonging to each. This was done in substantially the same manner that Mr. Lawrence had formerly made his new take-in. They commenced their new bank near the Passmore end of their bank and ran it out at right angles to the old bank about eighteen rods; then turned and ran parallel with, and about twenty rods distant from, the old bank towards the Lawrence line until they came nearly to the Lawrence line; then they turned towards the old bank until they came opposite the end of the new Lawrence bank; then, with the consent of the defendant, who had become the owner of the Lawrence meadow, they ran across the property line and about four rods on the Lawrence land and joined with the new Lawrence bank.

This new take-in includes about twenty-three acres of meadow.

After each of these new take-ins the old banks opposite the same were suffered to fall into decay.

Either at the time of the closing up by the complainants of their new bank with the new bank of the defendant, which occurred in the spring of 1875, or within a few years thereafter, and not later than 1880 (whether the one or the other being one of the disputed facts in the case), the complainants cut through the old bank at or near the property line of the two properties, and thereby drained a portion of their new take-in through the old system of ditches across the Lawrence meadow to the Lawrence sluice. After this was done, and as late as 1883, the defendant built a new sluice, and called upon the complainants to pay, and they did pay, their one-third of the expense. The old sluice was also repaired on one occasion after 1880, and the complainants were called upon and did pay their share of the expense. And it was admitted that they, and their father before them, had paid their allotted share of the expense of maintaining both ditches and sluice as often as called upon.

30

During the time that had elapsed between the original lay-out (whenever that was) and the new take-in of 1875 the deposit of sediment by the river had raised the flats outside the bank so that the new Springer meadow was nearly or quite two feet higher than the old meadow. The ditch laid down on the commissioners' map through the Lawrence meadow ran at first parallel with the line of the bank and about half way between that and the high land, and then turned and ran at right angles to the bank till it reached the sluice, which is situate about ninety-five rods from the line between Lawrence and Springer, and the greater portion of the Lawrence new take-in of 1856 was opposite to and drained into this ditch. In addition to the commissioners' ditch, other ditches were cut through the meadows connecting with it—one along the foot of the high land, and one near the foot of the bank, and another near the property line, called the "line ditch." In 1878 a very high tide occurred, accompanied by a northwest wind, which drove the water over all the banks, as well that of the Springers as that of the Lawrences, and made several breaches in each of them, and otherwise seriously damaged them. The Springers and Lawrence united in repairing the new banks.

So far the facts as above set forth were either proven or distinctly admitted at the hearing.

In 1889 the defendant informed the complainants that she would not permit them further to drain their meadows through her ditches, and in the early part of 1890 actually obstructed the end of her ditches near complainants' land, whereupon the complainants filed their bill.

At the hearing the case was presented as follows : The defendant said that she did not object to the drainage through her ditches of the meadow included within the commissioners' bank, but claimed that the Springer take-in of twenty-three acres in 1875 was unwarranted, and resulted in overcharging the ditches and sluice and in the serious injury of the defendant's meadow ; and further, that the new bank was poorly constructed originally, and for that reason, and for want of proper repair, had for the past four or five years become very leaky. To this

the complainants answered, that the defendant's new take-in of 1856 was in itself a license to the complainants to make one, and that they understood and supposed that they were acting within their rights in making a new take-in ; and further, that their take-in had been made in full sight of the defendant's agents, its construction extending over a period of three months or more, all without any objection or protest from the defendant, and that when they had it nearly finished and desired to lay a part of it across defendant's land, and to take mud from her flats for that purpose, they sent for her sons and agents, and they came on the ground and expressly consented to the work being finished in that way ; and that it was then and there stated to the defendant's sons that the complainants expected to drain the southwest end of the new take-in through the defendant's ditches. They further say, that after the new take-in had been accomplished and its full effect seen and felt, the defendant built a new sluice, and called upon the complainants to pay their share of the expense, which they did, and also the expense of one reparation of the old one. They further deny the allegation of bad construction and repair of their bank.

The disputed matters of fact are—*first,* as to what occurred at the interview when defendant's sons came on the ground and consented to the closing up of the bank, and as to when the water from complainants' new take-in first drained through the old bank into defendant's ditches ; and, *second,* as to whether or not the new bank was originally well constructed and had been kept in reasonably good repair.

The complainant Charles L. Springer swears that he and his brother sent for the Lawrence brothers to come on the ground at the time they were about closing up their new bank at the Lawrence end ; that either two or three of them came, of whom one was George B. Lawrence, the brother who swears that he, more than either of his brothers, acted as his mother's agent, and who admits that he was there. He (Charles L. Springer) swears that he asked permission to build the bank across a stretch of about four rods on land of the defendant to join with the corner of their (Lawrences') new bank, and asked them also for permis-

sion to get mud for that purpose off of their flat, if there was not sufficient found in the line ditch which they proposed to cut from their new bank along the property line and through the old bank to connect with the old line ditch. He several times repeats that the cutting of that line ditch through the old bank for the purpose of draining the new take-in into the old system of ditches was spoken of on that occasion, and that the Lawrences made no objection, but consented to the building of the bank and the taking of the mud, and did not protest or object to the drainage into their system of ditches; and he swears that shortly afterwards, and during that year, this line ditch was cut through the old bank and has been kept open ever since. He further says, that on the same occasion both the Lawrences asked the Springers why they did not take in more of the flats while they were about it—saying that they might just as well have taken in more. And he further swears, that it was the understanding at the time that one end of the new take-in was to be drained on to the defendant.

William H. Springer, who was present at the same interview, swears that on the occasion when he and his brother asked permission to join banks with the Lawrences, and to take mud from their flats to build the bank, they told them that he and his brother would run a water-course from that point out through the old bank to the old system of ditches, and he says that "they told us to go ahead and do it." And he says that, so far from making any objection, the Lawrences said that they might just as well have taken in more while they were about it.

Of the two Lawrence brothers who were present at this interview only George B. Lawrence was sworn. He swore that he was on the new Springer bank several times during its construction, and he does not deny that he and his brother, Browning Lawrence, were present at the interview in question, and consented to the joining up of the new bank on his mother's land, but he contradicts the story of the Springers, as follows:

"*Q.* Did you meet the Springers at the time they were closing, or were about to close, the new bank, twenty-three acres, against your bank?

"*A.* I did, sir; I did myself and my brother Browning.

"*Q.* Was there anything said at that time about draining the water from the new meadow, the twenty-three acres, through the old ditch or the line ditch and through the sluice?

"*A.* I mentioned it myself; they wanted to know if we had any objection to joining with our bank; Browning said, ' No;' *then I said, 'What is to become of the water?' William spoke up and said, 'We will take all the water the other way.'*

"*Q.* William Springer?

"*A.* Yes, sir; William Springer." [This is denied by the Springers, expressly by Charles and impliedly by William.]

And, further on, he swears as follows:

"*Q.* Was there ever any agreement between you, acting for your mother, and the Springers for the opening of this ditch through that bank into your system of drainage?

"*A.* No, sir.

"*Q.* Did you ever agree to abandon the commissioners' bank and accept the new one of the Springers?

"*A.* No, sir; there was nothing said about it.

"*Q.* Nothing was said about it by the Springers to you?

"*A.* No, sir.

"*Q. Did they ever say anything to you in reference to keeping the water from the twenty-three acres off of you?*

"*A. Not a word;* all they said was they could not drain it to the river; that is, Charles told us there, at the time we went over there to make that compromise.

"*Q.* (By the Court)—When was it?

"*A.* Three years ago.

"*Q.* (By Mr. Grey)—*The question I asked you was, whether they ever said anything to you about keeping the water from the twenty-three acres off of you?*

"*A. Not a word.*

"*Q. And not permitting it to drain on you?*

"*A. Not a word.*"

I am unable to reconcile these extracts. It seems to me that the portions I have italicized are in direct contradiction of each other. No excuse is offered for not producing Browning to support George.

On the part of the complainants one of the workmen (Richmond) who assisted in making the new bank was near by at the interview in question, and swears that the cutting through of the line ditch was mentioned.

There is another part of the case which I think affects the value of the evidence of George B. Lawrence. The bill distinctly alleges—

" "That shortly after the laying out of the said bank and water-courses by the said commissioners the said *Thomas R. Lawrence* [defendant's husband] *moved the bank enclosing his meadow further out towards the Delaware river, in order to take in a part of the flats that lay outside of the bank,* which necessitated a change in the position of the sluice on said Lawrence's bank, which change of sluice was made at the joint expense of Richard F. Springer and said Lawrence in the proportion aforesaid, and that subsequently, by mutual consent of the parties interested, the bank enclosing your orators' meadow was also moved further out towards the river, thereby enclosing a part of the flats that lay outside of the bank."

The answer, dealing with this allegation, says :

"And this defendant further *denies that after the laying out of said bank and water-courses by said commissioners said Thomas R. Lawrence moved the bank enclosing his meadow further out towards the Delaware river in order to take in part of the flats that lay outside of the bank, and says that the only taking in of any additional meadow was the enclosure by said Lawrence of corners and angles in running the bank straight rather than crooked, and that said bank was so straightened because it had been broken down and gone out to the tide, and in re-erecting said bank it was put on a straighter line."*

This answer was prepared from instructions given by George B. Lawrence, and, though called for without oath, was, for the purpose of resisting a motion for an injunction, verified by George B. Lawrence, as the agent of his mother. He appears to have managed the defence.

Further, the defendant produced at the hearing a map, marked "Exhibit No. 1 for defendant," which purported to represent the Springer and Lawrence meadows and banks, showing the old commissioners' bank as laid down on the commissioners' map and the new Springer bank, but omitting the new Lawrence bank. In order to do this it showed a small piece of bank at the property line where none actually exists. Later on in the hearing, after positive evidence had been given of the new Lawrence take-in, defendant produced a second map, marked "D 2," showing the new Lawrence take-in as it actually exists. The manifest object of the clause in the answer above recited, and of the imperfect map first produced, was to conceal, if possible, from the court the fact that the defendant's husband had made a considerable take-in in 1856. That the new bank constructed by Lawrence was not a mere strengthening of the old one is

manifest by a mere glance at the map. Under these circum-
stances I can place but little reliance upon the .testimony of
George B. Lawrence, and must believe the evidence of the
Springers as to the conversation about the continuation of the
line ditch through the old bank. The Springers swear it was
cut through the same season. The answer itself alleges that it
was cut through at the Lawrence end shortly after the big tide
of 1878, and, as I interpret the language, at the same time that
it was cut through the end next to Passmore; which it was
proven was done in the same season that the new bank was
built. George B. Lawrence, in his affidavit annexed to the
answer, read in evidence under stipulation, swears it was cut
through in 1879. At the hearing the Lawrences swore, on their
oral examination, that it was not cut through until 1880, and
that up to that time the whole of the new take-in was drained
through Passmore. Charles Sharp, who has been the tenant of
the defendant's farm since the spring of 1878, swears, in his affi-
davit annexed to the bill, that he was acquainted with the mead-
ows before the time he rented the defendant's farm, and that *at
first the water from the new Springer take-in ran through the old
Springer bank and so into the ditches and so found its way into
the Lawrence ditches*. Further on he speaks of the cut through
the old bank at the property line without fixing its date. On
his oral examination at the hearing he swears, upon his direct
examination, that the line ditch was cut in the first place from
the new Springer bank down to the old bank, and was not cut
through the old bank at the Lawrence end until 1880, and that
in the meantime, or for at least a year before 1880, the water
passed from the new Springer take-in through notches or cuts in
the Lawrence bank on to the Lawrence meadow, and "they [I
do not know whom he means by they] stopped these notches
in our [meaning the Lawrences'] old bank, and then it was cut
through here [meaning through the old bank] next the Law-
rences, to let it come into the line ditch." Further on, upon
cross-examination, he swears that no part of the water coming
from the new take-in found its way into the Lawrence ditches

until after the particular cut through the bank which he says was made in 1880.

From all the evidence I think it remains somewhat in doubt whether the particular cut through the old bank near the Springer and Lawrence line, which now exists, was made the same year that the new Lawrence bank was built, but I am entirely satisfied that from the very first the share or portion of the water falling upon the new take-in, which naturally flowed toward and belonged in the Lawrence ditches, actually found its way through one or both of the banks into the Lawrence ditches and out through the Lawrence sluice. And I am further satisfied that this was the expectation and understanding of all parties from the start, and that the Lawrences must have known and expected that the Springers intended to drain a portion of their new take-in through the Lawrence system of ditches. And I do not believe that the Springers ever promised the Lawrences that they would drain the new take-in through the Passmore system.

This view is strengthened by the fact that the defendant called upon the complainants to pay their allotted share of the expense of repairing and rebuilding their sluice long after the drainage of their new take-in had been—even according to defendant's theory of the facts—turned into their system of ditches, and never made any objection to the drainage until within two or three years. If there had been any expectation, promise or arrangement that the new take-in was to be drained through the Passmore system, it seems to me the Lawrences would have protested as soon as it was turned on to them, and would not have, so to speak, ratified it by calling upon the Springers to pay their share of the repairs and renewal of the sluice.

The defendant, in order to strengthen her position, proved that some two or three years ago her sons and Mr. Beckett offered to the complainants to pay the expense of a sluice to be erected by the complainants to drain their new take-in directly into the river. The complainants declined to accept this offer, and at the hearing proved, to my satisfaction, that it was impracticable to maintain a sluice through their bank, for the reason that the distance from its outlet to low-water mark was so great that the

intervening vent or passage-way would be liable to be continually filled up by the wash of the waves. The complainants, on their side, swore (and it was not denied), that they had frequently spoken to the Lawrences about clearing out their ditches ; asked them to clear them out, and offered to pay their share of the expense, and that the Lawrences had replied that it was none of their (the Springers') business; the ditches suited them (the Lawrences) and that was enough ; and in other ways manifested their disposition to treat the works on their lands as being entirely under their control and beyond the control of the complainants. And I may add that there is ground to suspect, at least, from all the evidence, that Mr. Beckett is the instigator of the Lawrences in their attempt to close the connecting ditches of their land ; and they seem to be acting in unison in an attempt to get rid of all drainage from the Springers. Whether, owing to the cost of keeping up their ditches, sluices and banks, they intend to abandon their meadows, or what their object may be, does not appear.

The rights of the parties arising out of these facts seem plain enough. In the first place, when Thomas R. Lawrence made his new take-in of 1856 he thereby plainly increased the burden of the system of ditches and sluices established by the commissioners and obtained more than his share of the benefits thereof. It is no answer to this view to say that this new take-in and the ditches and sluices were on his own land. His neighbor, Springer, had an interest in them, because he was bound to pay one-third the expense of their maintenance, and had quite as much right as Lawrence to increase the burden upon them. I think it follows that the new Lawrence take-in operated as a license to Springer to make a corresponding take-in on his land, or, at least, that the Springers were justified in supposing that they had such right. They swear that they proceeded upon that supposition. The defendant, by her agent, saw what was being done. The agent was on the ground several times during the progress of the work and made no objection. He must have known, or at least ought to have known, that it was the expectation of the Springers to drain a part of it into the defendant's system, and that they were

acting on the supposition that they had the right so to do.  He made no objection, either during the earlier stages of the work or when it was about to be finished, and he was expressly informed that the plans of the complainants included the drainage in part of the twenty-three acres through his mother's system.

Now, it seems to me that, applying to these circumstances the principle stated and acted upon in the recent cases of *Sumner* v. *Seator* and *The Morton Brewing Company* v. *Morton*, in this court, the defendant is estopped from now saying that the complainants have by their action in question disentitled themselves to the benefits of the ditches and sluices on her land.  Undoubtedly the defendant might at the time well have objected to the work on the score of the excessive quantity of the new take-in— that it was more than complainants were, under any view, entitled to—but there is no pretence of her having done this.  And again, afterwards, in 1883, when the new sluice was built, she might have called for the building of a larger sluice and a readjustment and division of the expense of maintenance of both sluice and ditches.  But nothing of the kind was done, and the new sluice was built, as defendant insists, of the same size as the old one. In fact there was apparently no thought of any danger that the old sluice was not large enough or that the then existing system was inefficient to dispose of the water until within three or four years past.  George B. Lawrence swears that the meadows began to deteriorate about five years ago.  Charles Sharp (the tenant) swears that they began about five or six years ago.  He says, in his affidavit annexed to the answer, that six or seven years ago he raised an exceptionably fine crop of corn on one part of them, where last year he found the ground so miry that he could not gather the grass.  And the answer is framed upon the idea that owing to the dilapidated condition of the complainant's bank for the last five or six years it has leaked so much water at high tide as to flood and ruin the meadows.  And Beckett swears that so much water has come from Springer's land on to his since he has owned the Passmore tract (which has been over four years) that his sluice could not work it off.

This brings me to the consideration of the evidence given on both sides as to the original construction and subsequent maintenance of the complainants' new bank. It is an admitted and well-known fact that a new bank is more liable to be injured by high tides and waves, and more difficult to keep in repair, than an old one. This was known to the defendant's agent when the bank was built, and therefore any lack of efficiency in the bank arising from that cause must be laid out of view. But it is alleged on the one side and denied on the other that it was in the first place poorly constructed of poor materials, and that it has been neglected and allowed to fall into dilapidation for the last five or six years. I shall not rehearse the evidence on this subject, but content myself with saying that, after a careful examination of the evidence on both sides, I am satisfied that the bank was originally well built upon a good foundation and of good materials, and that it has been kept ever since in as good repair as is practicable. It was an admitted fact that all banks are liable to become leaky by reason of the operation of vermin, and that they require constant attention; and it is abundantly proven that the complainants have given their bank good attention.

The increase of water for the last few years and the degeneration of the meadows are easily accounted for from other causes than the leakage from the complainants' bank. In the first place, the Passmore farm, now owned by Beckett, was for several years before his purchase, which was in 1885, owned by non-residents, heirs of a former owner, who rented it out, paying little attention to the ditches and banks, and by reason of this neglect the ditches became filled up and the banks broken. And Mr. Beckett since his ownership has not kept them in such repair as he ought, and on one or more occasions has reversed his sluice-gate so as to deliberately flood his meadows. The waters thus let in upon the Passmore-Beckett meadows have found their way around to the Lawrence meadows through a ditch which skirts the new Springer bank from end to end; and the Lawrences have also, on one or more occasions, reversed their sluice-gate so as to keep the waters on the meadows. Then, in the second place, it is not only proven in the cause by direct evidence, but is a well-known

fact, that for the last four or five years the seasons have been unusually wet and the rainfall unusually great, so that an unusual amount of work has been put upon the ditches and sluices. In the third place, the ditches of the Lawrence system have been in a declining and obstructed condition, and one of them, the commissioners' ditch, has been obstructed near the property line. At that point a bridge across the ditch was constructed by placing in its bottom a square trunk of plank, covered with dirt. That trunk was expected to, and did at first, carry the water through freely and sufficiently, but of late years it has become obstructed, and the water, instead of passing through it, has run over on the sides and escaped on to the meadows. This of itself would be sufficient to soak and ruin them. These several causes combined are quite sufficient, in my judgment, to account for the condition of the meadows of late years.

I have said that the defendant might have objected to the quantity of the new Springer take-in. It seems to me she might also have objected to the ditch of which I have just spoken as skirting the new Springer bank on the inside, and which was called by the witness a "leak-catching ditch," and by which water backing up from the Passmore meadow on to the Springer could find its way freely around on to the Lawrence meadows. This seems to me not consistent with the scheme of the original lay-out of 1851, which seems to have contemplated a division bank through the Springer meadows. As before stated, these meadows are divided on the commissioners' map by a bank which I infer (although no proof was given on the subject) prevented any water from the Passmore going over on to the Lawrence meadow, and *vice versa.* Now, the ditch at the foot of the new Springer bank changed this state of things, and, if I am right in my inferences, Mrs. Lawrence would probably have been entitled to object to that ditch being continuous, and to have required that the new take-in should be divided by a bank substantially as the old take-in was—that is, that the cross-bank on the Springer meadow should be extended from the old Springer bank to the new Springer bank. The question I have now to deal with is, whether, as a condition of granting the complainants relief, any

terms should be imposed upon them in these matters, on the principle that he who asks should do equity. At the hearing the complainants offered to pay any additional share which they ought to pay towards maintaining the ditches and sluices. Nothing was said about a division of the new take-in by a cross-bank, but I presume if complainants' attention had been called to it they would have made their offer to include it.

My conclusion upon the whole case is, that the complainants are entitled to the relief substantially as prayed for by them, but it must be upon terms of their submitting to a readjustment of the apportionment of the cost of maintaining the ditches and sluice on the Lawrence land and to their extending the old cross-bank through the new take-in up to the new bank.

At the argument the point was made by the defendant that the complainants were the owners in severalty of portions of the twenty-three-acre take-in and held no lands in common, and therefore could not maintain a joint suit in regard to the meadows. The utmost effect that could be given to this objection would be to dismiss the bill as to the complainant William, who owns that part of the twenty-three acres lying towards the river. But the bill in this respect is clearly within the one hundred and thirty-first rule of the court, and the objection cannot prevail.